IN THE UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF OHIO
EASTERN DIVISION

| | | |
|---|---|---|
| PENNY FORSTROM, | ) | |
| | ) | CASE NO. 4:14-CV-1777 |
| Plaintiff, | ) | |
| v. | ) | |
| | ) | MAGISTRATE JUDGE |
| | ) | KENNETH S. McHARGH |
| | ) | |
| COMMISSIONER OF SOCIAL | ) | |
| SECURITY ADMINISTRATION, | ) | **MEMORANDUM OPINION &** |
| | ) | **ORDER** |
| Defendant. | ) | |

This case is before the Magistrate Judge pursuant to the consent of the parties. (Doc. 15).

The issue before the undersigned is whether the final decision of the Commissioner of Social

Security ("Commissioner") denying Plaintiff Penny Forstrom's ("Plaintiff" or "Forstrom")

applications for Supplemental Security Income benefits under Title XVI of the Social Security

Act, 42 U.S.C. § 1381 *et seq*., and for a Period of Disability and Disability Insurance benefits

under Title II of the Social Security Act, 42 U.S.C. §§ 416(i) and 423, is supported by substantial

evidence and, therefore, conclusive.

For the reasons set forth below, the Court AFFIRMS the Commissioner's decision.

## I.  PROCEDURAL HISTORY

On July 9, 2012, Forstrom filed applications for Supplemental Security Income benefits

and Disability Insurance benefits, alleging disability as of May 23, 2012. (Tr. 177, 181). Plaintiff

claimed that she was disabled due to suffering from neuropathy, spinal stenosis, chronic

obstructive pulmonary disease ("COPD"), anxiety, depression, blindness in the right eye, a

compromised immune system, and gastroesophageal reflux disease ("GERD").  The Social

Security Administration denied her claims initially and upon reconsideration. (Tr. 128, 132, 139, 146).

Plaintiff filed a request for a review before an administrative law judge ("ALJ"). (Tr. 151). ALJ Yelanda Collins convened an administrative hearing on March 31, 2014, to evaluate Plaintiff's applications. (Tr. 32-59). Plaintiff, represented by counsel, appeared and testified before the ALJ. (*Id*). A vocational expert ("VE"), Lynn Smith, also appeared and testified. (*Id.*).

On April 24, 2014, the ALJ issued an unfavorable decision, finding Plaintiff was not disabled. (Tr. 12-24). After applying the five-step sequential analysis,[1] the ALJ determined Plaintiff retained the ability to perform work existing in significant numbers in the national economy. (*Id.*). Subsequently, Plaintiff requested review of the ALJ's decision from the Appeals

---

[1] The Social Security Administration regulations require an ALJ to follow a five-step sequential analysis in making a determination as to "disability." *See* 20 C.F.R. §§ 404.1520(a), 416.920(a). The Sixth Circuit has summarized the five steps as follows:

(1) If a claimant is doing substantial gainful activity–i.e., working for profit–she is not disabled.

(2) If a claimant is not doing substantial gainful activity, her impairment must be severe before she can be found to be disabled.

(3) If a claimant is not doing substantial gainful activity and is suffering from a severe impairment that has lasted or is expected to last for a continuous period of at least twelve months, and her impairment meets or equals a listed impairment, claimant is presumed disabled without further inquiry.

(4) If a claimant's impairment does not prevent her from doing her past relevant work, she is not disabled.

(5) Even if a claimant's impairment does prevent her from doing her past relevant work, if other work exists in the national economy that accommodates her residual functional capacity and vocational factors (age, education, skills, etc.), she is not disabled.

*Abbott v. Sullivan*, 905 F.2d 918, 923 (6th Cir. 1990); *Heston v. Comm'r of Soc. Sec.*, 245 F.3d 528, 534 (6th Cir. 2001).

Council. (Tr. 8).  The Appeals Council denied the request for review, making the ALJ's April 24, 2014, determination the final decision of the Commissioner. (Tr. 1-4).  Plaintiff now seeks judicial review of the ALJ's final decision pursuant to 42 U.S.C. §§ 405(g) and 1383(c).

## II.  EVIDENCE

### A.  Personal Background Information

Plaintiff was born on July 16, 1963, and was 48-years-old as of her alleged disability onset date and 50-years-old as of her hearing date. (Tr. 177).  As a result, she was considered a "person closely approaching advanced age" for Social Security purposes. 20 C.F.R. §§ 404.1563(d), 416.963(d).  Forstrom completed high school and has past relevant work as a cook. (Tr. 35, 51).

### B.  Medical Evidence

#### 1.  Physical Impairments

During 1990, approximately 12 years prior to her alleged onset date of disability, Plaintiff underwent left wrist surgery. (Tr. 337-38).  Following this procedure, there do not appear to be any records of medical treatment related to her wrist until September 20, 2011.  On that date, Plaintiff presented to the emergency room due to left hand numbness and wrist drop. (*Id.*).  An x-ray of her forearm was recommended. (Tr. 339).  A healthcare provider opined that Plaintiff appeared to have radial nerve palsy.  She was instructed to wear a wrist brace at work and discharged in improved and stable condition. (*Id.*).

On February 15, 2012, Plaintiff treated with Matthew Hiestand, M.D., for what was described as "low back syndrome" with chronic low back pain. (Tr. 280).  Plaintiff also complained of discomfort in her legs after prolonged sitting or standing.  At the time, Plaintiff

did not have insurance.  Dr. Hiestand recommended further tests and a referral to pain management or a neurologist, but Plaintiff did not wish to seek further treatment. (*Id.*).

On May 13, 2012, Plaintiff returned to Dr. Hiestand and indicated that she was taking Neurontin and Vicodin. (Tr. 279).  Dr. Hiestand noted that during a physical examination, Plaintiff had "4 out of 5" strength in her lower extremities and difficulty rising from a chair.  She walked with slightly stooped posture.  Dr. Hiestand diagnosed failed low back syndrome with spinal stenosis, major depressive disorder with anxiety, legal blindness in Plaintiff's right eye, and ongoing tobacco use.  The doctor prescribed an increase in Neurontin.  He noted that Plaintiff's current employment involved prolonged standing and occasionally carrying objects weighing up to 10 pounds, which caused discomfort due to Plaintiff's back issues. (*Id.*).

On May 27, 2012, Plaintiff presented to the emergency room with complaints of cough, congestion, some shortness of breath, and rib pain. (Tr. 271).  Despite Plaintiff's history of COPD, she continued to smoke. She thought she had pneumonia, but she was diagnosed with a COPD exacerbation and tobacco abuse. (Tr. 271-72).  She was placed on Avelox, a prednisone tapering course, and inhalers. (Tr. 272).  The physician discharged her home in stable condition.

Plaintiff followed up with Dr. Hiestand on June 4, 2012, and indicated that she had not experienced much improvement. (Tr. 278).  She continued to smoke a half a pack of cigarettes per day.  A physical examination showed expiratory wheezes in the lungs, and Dr. Hiestand assessed a COPD exacerbation.  The doctor stressed the importance of smoking cessation, prescribed medication, and released Plaintiff from work until June 10, 2012. (*Id.*).

On June 12, 2012, Plaintiff returned to Dr. Hiestand to treat depression, anxiety, low back pain, and COPD. (Tr. 277).  Dr. Hiestand observed that Plaintiff's COPD exacerbation appeared to have improved, as an examination showed she was breathing more comfortably, had no

4

wheezes, and good air exchange, despite Plaintiff's statements that she was not feeling much improvement. Dr. Hiestand observed that Plaintiff was somewhat emotional that day, but opined that it was due to a high dose of steroids she was recently on and had finished. He diagnosed an improved COPD exacerbation, failed low back syndrome, and generalized anxiety disorder with depression.  Dr. Hiestand wrote Plaintiff an off-work slip for an "indefinite" time period, emphasized smoking cessation, and instructed her to return in three months. (*Id.*).

On August 15, 2012, Dr. Hiestand filled out a form in connection with Plaintiff's application for disability. (Tr. 275-76).  He listed Plaintiff's diagnoses as low back syndrome (spinal stenosis) with chronic pain, chronic COPD, anxiety, and depression. (Tr. 275).  In terms of clinical examination findings, the doctor listed a limited range of motion in the spine and decreased strength in the left leg. (*Id.*).  Dr. Hiestand opined that Plaintiff could not perform any physical labor due to issues with her back and lungs. (Tr. 276).

During September 2012, Dr. Hiestand continued to encourage Plaintiff to cut back on smoking as she was still experiencing symptoms from her moderate COPD. (Tr. 298).  The doctor recommended a drug screening, which was positive for benzodiazepine, opiates, and cannabinoids. (Tr. 301, 306, 400).

On October 14, 2012, state agency reviewing physician Jan Gorniak, D.O., reviewed the record and opined as to Plaintiff's physical abilities. (Tr. 66-69).  Dr. Gorniak concluded that Plaintiff could perform light work activity. (Tr. 67).  She could not use her left upper extremity to perform pushing, pulling, or use hand controls due to radial nerve palsy. (*Id.*).  He also opined that Plaintiff was limited in her ability perform gross and fine manipulation with her left hand. (Tr. 68).  Plaintiff could never climb ladders, ropes, or scaffolds; occasionally stoop and crawl;

and frequently kneel and crouch. (Tr. 67). Dr. Gorniak also recommended a number of environmental limitations. (Tr. 68-69).

By December 2012, Dr. Hiestand was still discussing the critical importance of smoking cessation with Plaintiff. (Tr. 359). Even so, the doctor noted that despite Plaintiff's COPD, depression, and low back pain, her condition was stable and unchanging. The doctor stated that Plaintiff was disabled by her dyspnea with exertion and chronic low back pain. (*Id.*).

Plaintiff was hospitalized from January 30, 2013, through February 1, 2013, for pneumonia and an exacerbation of her COPD. (Tr. 393-97, 401-03, 422-23). During March 2013, Plaintiff returned to Dr. Hiestand with complaints of gradually increasing leg discomfort and neuropathy stemming from her low back pain syndrome. (Tr. 447). Dr. Hiestand emphasized the importance of obtaining imagining studies of Plaintiff's back, but Plaintiff declined, allegedly due to lack of insurance. (*Id.*).

On April 26, 2013, Randy Plona, D.O., performed a one-time consultative physical examination. (Tr. 447-51). Plaintiff reported that the pain in her low back averaged a "9 out of 10" and stayed at that severity, no matter whether she sat, stood, or walked. (Tr. 449). Plaintiff's physical examination revealed normal findings, including a normal range of motion in the back and extremities. (Tr. 405-51). Dr. Plona commented that although Plaintiff "complained of a 9/10 pain in her low back, she showed no signs of difficulty or discomfort throughout her entire physical examination." (Tr. 451). The doctor opined that Plaintiff would have no musculoskeletal limitations when performing work activities, and she could walk, stand, and sit at will. Dr. Plona found no limitations with Plaintiff's ability to use her hand. (*Id.*).

An x-ray of Plaintiff's left hand and wrist was taken in April 2013. (Tr. 452). It showed post-surgical changes with a fusion of the distal radius and ulna. There was post-traumatic and

post-surgical deformity of the radius and ulna, but no acute osseous abnormality.  Joint spaces were maintained and there was no soft tissue swelling or periosteal reaction. (*Id.*).

In May 2013, state agency reviewing physician Maureen Gallagher, D.O., assessed the record. (Tr. 100-03).  She largely agreed with Dr. Gorniak's assessment, but opined that Plaintiff had no limitations on pushing and pulling, other than those imposed by the light exertional level. (Tr. 100).  Dr. Gallagher also found that Plaintiff was unlimited in her ability to perform fine manipulation with the left hand and could occasionally perform gross manipulation with the left hand. (Tr. 101).

Plaintiff returned to Dr. Hiestand on July 12, 2013, and complained of intense, daily back pain, causing her to walk slightly stooped. (Tr. 462). Plaintiff had difficulty climbing onto the examination table and straight leg raising immediately produced left leg symptoms.  Dr. Hiestand also noted a severely reduced range of motion in the spine. (*Id.*).  The doctor ordered an x-ray of the lumbar spine, which showed minimal degenerative changes. (Tr. 462, 464).

On August 15, 2013, Dr. Hiestand performed a physical examination in connection with Plaintiff's application for disability. (Tr. 466).  Plaintiff had diminished breath sounds, a prolonged expiratory phase, tenderness over the lumbar spine and low back, and a limited range of motion in the low back and spine. (Tr. 466).

That same day, Dr. Hiestand completed a physical residual functional capacity assessment. (Tr. 459-60).  He opined that Plaintiff could lift less than five pounds occasionally; stand or walk for a total of 2 hours during an 8-hour workday; and sit for a total of 4 hours during an 8-hour workday. (Tr. 459).  Plaintiff could "rarely" climb, balance, stoop, crouch, kneel, crawl, reach, push or pull, and perform fine manipulation. (Tr. 459-60). Dr. Hiestand found that Plaintiff needed to elevate her legs to 90 degrees at will and required additional

7

unscheduled rest periods during the workday. (Tr. 460).  The doctor indicated that he based these restrictions on Plaintiff's bilateral carpal tunnel syndrome with hand numbness, back pain with knee and leg pain, poor balance, poor strength, and asthma. (Tr. 459-60).

Dr. Hiestand's treatment notes from October 2013 indicate that upon physical examination, Plaintiff appeared comfortable. (Tr. 468).  Plaintiff's expiratory phase was not prolonged, but it was clear. (*Id.*).

On January 13, 2014, Plaintiff complained to Dr. Hiestand about problems with her right ear, nasal congestion, and a sore mouth. (Tr. 475).  On physical examination, Plaintiff appeared comfortable at rest and was able to climb on the examination table.  She was somewhat stiff in her back.  Her chest sounds were clear with prolonged expiratory phase and slightly diminished breath sounds.  There was no apparent weakness in her legs. (*Id.*).

### 2.  Mental Impairments

On September 4, 2012, state agency reviewing psychologist Jennifer Swain, Psy.D., assessed the medical record. (Tr. 69-70).  She opined that Plaintiff was moderately limited in her ability to perform activities within a schedule, maintain regular attendance, and be punctual within customary tolerances. (Tr. 70).  Plaintiff was also moderately limited in her ability to complete a normal workday and workweek without interruptions from psychologically based symptoms and to perform at a consistent pace. Dr. Swain further explained that Plaintiff's depressive symptoms may interfere with pace and persistence over time, but she retained the ability to complete three- to four-step moderately complex tasks.  The psychologist also indicated that Plaintiff "[m]ay have some increased absences when experiencing [a] depressive episode." (*Id.*).

8

On August 22, 2012, Sylvester Huston, Ph.D., performed a psychological consultative examination of Plaintiff. (Tr. 288-94).  A mental status examination revealed no abnormalities in speech or thought content; an appropriate affect and cooperative mood; no motor manifestations of anxiety; a full orientation; and average intellectual functioning. (Tr. 295-96).  Dr. Huston noted that despite Plaintiff's reported difficulties with depression and anxiety, she had not sought mental health treatment. (Tr. 293).  The psychologist diagnosed major depressive disorder, moderate and recurrent, as well as alcohol dependence in early, sustained remission. (*Id.*).  Dr. Huston opined that Plaintiff would be able to understand and apply instructions in a work setting consistent with average intellectual functioning; would be able maintain attention, concentration, persistence, and pace for simple and multi-step tasks; would not be limited in her ability to respond appropriately to supervision and coworkers; and could respond appropriately to work-related pressures. (Tr. 293-94).

On March 8, 2013, state agency reviewing psychologist Mary Hill, Ph.D., evaluated the record. (Tr. 103-04).  She agreed with Dr. Swain's assessment. (*Id.*).

On June 14, 2013, Plaintiff treated with primary care physician Dr. Hiestand for depression. (Tr. 461).  She had been denied disability, but was able to get medical assistance through Medicaid. Plaintiff indicated there were numerous positive things in her life and could not identify why she felt depressed, though she thought her chronic pain contributed. Dr. Hiestand prescribed Venlafaxine and Dulera, and increased Xanax and Gabapentin. (*Id.*).

Plaintiff returned to Dr. Hiestand on July 12, 2013, and was tearful during the examination. (Tr. 462).  She felt that Xanax was helpful, but wanted to take Paxil again.

On August 15, 2013, Dr. Hiestand completed a mental residual functional capacity form. (Tr. 457-58).  He opined that Plaintiff could "rarely" preform the following tasks:  maintain

regular attendance and be punctual within customary tolerance; function independently without redirection; work in coordination with or in close proximity to others without being distracted; deal with work stress; complete a normal workday and workweek without interruption from psychologically-based symptoms and perform at a consistent pace without an unreasonable number of breaks; and understand, remember, and carry out complex or detailed job instructions. (Tr. 457-58).  The doctor based these restrictions on Plaintiff's generalized anxiety disorder, severe COPD, failed low back syndrome, and depression. (Tr. 458).

### III. SUMMARY OF THE ALJ'S DECISION

The ALJ made the following findings of fact and conclusions of law:

1. The claimant meets the insured status requirements of the Social Security Act through December 31, 2017.

2. The claimant has not engaged in substantial gainful activity since May 23, 2012, the alleged onset date.

3. The claimant has had the following severe impairments: degenerative disc disease of the lumbar spine and spinal stenosis [hereinafter, collectively, "lumbar impairment"], chronic obstructive pulmonary disease, and right eye blindness.

4. The claimant does not have an impairment or combination of impairments that meets or medically equals the severity of one of the listed impairments in 20 C.F.R. Part 404, Subpart P, Appendix 1.

5. After careful consideration of the entire record, the undersigned finds that the claimant has the residual functional capacity to perform light work as defined in 20 CFR 404.1567(b) and 416.967(b) except the claimant may occasionally balance, stoop, kneel, crouch, crawl, climb ramps and stairs, but may never climb ladders, ropes, or scaffolds; the claimant must avoid concentrated exposure to humidity, wetness, extremes of temperature, and pulmonary irritants, including dust, fumes, odors, gases, and poor ventilation, and all exposure to workplace hazards, including unprotected heights or dangerous moving machinery; the claimant is precluded from jobs requiring accurate binary vision or depth perception; the claimant is limited to performance of work tasks undertaken in a low stress setting, defined as one imposing no more than an average production rate pace or quota, with no more than infrequent changes in work duties, and gradual introduction of such changes as do occur, into the job process.

6. The claimant is unable to perform any past relevant work.

7. The claimant was born on July 16, 1963, and was 48 years old, which is defined as an individual closely approaching advanced age, on the alleged disability onset date.

8. The claimant has a high school education and is able to communicate in English.

    . . .

10. Considering the claimant's age, education, work experience, and residual functional capacity, there are jobs that exist in significant numbers in the national economy that the claimant can perform.

11. The claimant has not been under a disability, as defined in the Social Security Act, from May 23, 2012, through the date of this decision.

 (Tr. 12-24) (internal citations omitted).

## IV. DISABILITY STANDARD

A claimant is entitled to receive Disability Insurance and/or Supplemental Security Income benefits only when she establishes disability within the meaning of the Social Security Act. *See* 42 U.S.C. §§ 423, 1381. A claimant is considered disabled when she cannot perform "substantial gainful employment by reason of any medically determinable physical or mental impairment that can be expected to result in death or that has lasted or can be expected to last for a continuous period of not less than twelve (12) months." *See* 20 C.F.R. §§ 404.1505, 416.905.

## V. STANDARD OF REVIEW

Judicial review of the Commissioner's benefits decision is limited to a determination of whether, based on the record as a whole, the Commissioner's decision is supported by substantial evidence, and whether, in making that decision, the Commissioner employed the proper legal standards. *See Cunningham v. Apfel*, 12 F. App'x 361, 362 (6th Cir. 2001); *Garner v. Heckler*, 745 F.2d 383, 387 (6th Cir. 1984); *Richardson v. Perales*, 402 U.S. 389, 401 (1971). "Substantial evidence" has been defined as more than a scintilla of evidence but less than a preponderance of the evidence. *See Kirk v. Sec'y of Health & Human Servs.*, 667 F.2d 524, 535 (6th Cir. 1981). Thus, if the record evidence is of such a nature that a reasonable mind might

11

accept it as adequate support for the Commissioner's final benefits determination, then that determination must be affirmed. *Id.*

The Commissioner's determination must stand if supported by substantial evidence, regardless of whether this Court would resolve the issues of fact in dispute differently or substantial evidence also supports the opposite conclusion. *See Mullen v. Bowen*, 800 F.2d 535, 545 (6th Cir. 1986); *Kinsella v. Schweiker*, 708 F.2d 1058, 1059 (6th Cir. 1983). This Court may not try the case de novo, resolve conflicts in the evidence, or decide questions of credibility. *See Garner v. Heckler*, 745 F.2d 383, 387 (6th Cir. 1984). However, it may examine all the evidence in the record in making its decision, regardless of whether such evidence was cited in the Commissioner's final decision. *See Walker v. Sec'y of Health & Human Servs.*, 884 F.2d 241, 245 (6th Cir. 1989).

## VI.  ANALYSIS

### A.  The ALJ's Finding at Step Two of the Sequential Evaluation

In her first allegation of error, Plaintiff asserts that the ALJ's step two finding is flawed. According to Plaintiff, the ALJ erroneously concluded that her left hand and wrist issue did not qualify as a "severe" impairment. In support of this argument, she points to emergency room treatment in September 2011; opinions from state agency reviewing physicians Drs. Gorniak and Gallagher, in which they imposed restrictions on use of the left hand and arm; an April 2013 x-ray; and restrictions recommended by her treating physician, Dr. Hiestand.

The second step in the sequential analysis, determining whether a claimant suffers from any severe impairment, is used as a screening tool, permitting ALJs to dismiss "totally groundless" claims from a medical standpoint at an early stage in the analysis. *Higgs v. Bowen*, 880 F.2d 860, 863 (6th Cir. 1988). The claimant must show that he has an impairment which significantly interferes with his ability to do basic work activities.

416.920(c).  The ALJ's ruling is viewed under a *de minimis* standard.  *Salmi v. Sec'y of Health & Human Servs.*, 774 F.2d 685, 691-92 (6th Cir. 1985); *Childrey v. Chater*, 91 F.3d 143 (6th Cir. 1996) (Table).  Accordingly, a claimant's impairment will only be construed as non-severe when it is a "slight abnormality which has such a minimal effect on the individual that it would not be expected to interfere with the individual's ability to work irrespective of age, education and work experience."  *Farris v. Sec'y of Health & Human Servs.*, 773 F.2d 85, 90 (6th Cir. 1985) (*citing Brady v. Heckler*, 724 F.2d 914, 920 (11th Cir. 1984)).

Nonetheless, an ALJ's failure to properly name one of a claimant's impairments as severe will not always constitute reversible error.  Remand is not necessary, so long as the ALJ finds the claimant to suffer from at least one severe impairment and continues to evaluate both the claimant's severe and non-severe impairments at the latter stages of the sequential analysis.  *Maziarz v. Sec'y of Health & Human Servs.*, 837 F.2d 240, 244 (6th Cir. 1987); *Nejat v. Comm'r of Soc. Sec.*, 359 F. App'x 574, 577 (6th Cir. 2009) ("And when an ALJ considers all of a claimant's impairments in the remaining steps of the disability determination, an ALJ's failure to find additional severe impairments at step two does 'not constitute reversible error.'") (*citing Maziarz*, 837 F.2d at 244).

In the present case, the ALJ assessed Plaintiff's left wrist and hand impairment while performed the analysis at step two. (Tr. 15).  The ALJ noted that Plaintiff underwent left wrist surgery in 1990, which was 12 years prior to her alleged onset date, and thus very remote in time.  The ALJ also indicated that Plaintiff's May 2013 x-ray of the left forearm and wrist showed only expected post-surgical changes and was otherwise normal, with no osseous abnormality.  Although Plaintiff sought emergency room treatment in 2011 for acute radial nerve palsy, no repeat of the condition was reported.  The ALJ concluded that based on the evidence,

13

the impairment would not impose more than minimal limitations on Plaintiff's ability to engage in basic work activity. (*Id.*).

Even assuming the ALJ's analysis of the left hand and wrist impairment at step two was flawed, any error in this regard is harmless.  When formulating the RFC, the ALJ continued to account for Plaintiff's hand and wrist impairment, even though it was not deemed "severe." (Tr. 21).  The ALJ specifically confronted Drs. Gorniak and Gallagher's suggested limitations on handling, fingering, and gross manipulation.  The ALJ provided reasonable grounds for rejecting these findings, which Plaintiff does not now specifically challenge.  The ALJ also provided good reasons for attributing little weight to Dr. Hiestand's opinion, which will be discussed further herein.  Moreover, the ALJ discussed the April 2013 x-ray evidence and noted that it indicated no osseous abnormality, despite some post-surgical issues with the radius and ulna.  The ALJ observed that a healthcare provider's opinion that Plaintiff appeared to have radial nerve palsy occurred the year before her alleged onset date, and healthcare providers never made this diagnosis again, despite Plaintiff's continued treatment during the disability period. (*Id.*). Accordingly, even if the ALJ erred in failing to characterize Plaintiff's left hand and wrist issue as "severe," such an error does not warrant remand.

### B.  The ALJ's Treating Physician Analysis

Plaintiff also alleges that the ALJ ought to have accorded controlling weight to the opinions of treating physician Dr. Hiestand.  She maintains that the reasons the ALJ provided for discrediting Dr. Hiestand are not "good reasons" and fail to support the treating source analysis, given Dr. Hiestand's treating relationship, consistent reports in patient notes, and the findings and details Dr. Hiestand relied upon in formulating his opinions.  Dr. Hiestand began treating

14

Plaintiff as early as February 2012 and provided treatment for physical and mental impairments. (Tr. 280).  The doctor completed three medical source opinions.

Two of Dr. Hiestand's opinions addressed Plaintiff's physical limitations and one confronted her mental limitations.  First, on August 15, 2012, Dr. Hiestand opined that Plaintiff could not perform any physical labor due to issues with her back and lungs. (Tr. 276).  One year later, on August 15, 2013, Dr. Hiestand found that Plaintiff could perform some physical activity, but was notably restricted in her ability to lift, walk, sit, and perform other postural and manipulative tasks. (Tr. 459-60).  Dr. Hiestand indicated that Plaintiff needed to elevate her legs to 90 degrees at-will and required additional unscheduled rest periods. (Tr. 460).  The doctor based these restrictions on Plaintiff's bilateral carpal tunnel syndrome with hand numbness; back, knee, and leg pain; poor balance and strength; and asthma. (Tr. 459-60).  Also on August 15, 2013, Dr. Hiestand opined that Plaintiff could rarely perform a range of work-related mental tasks. (Tr. 457-58).

It is well-established that an ALJ must give special attention to the findings of the claimant's treating sources. _Wilson v. Comm'r of Soc. Sec._, 378 F.3d 541, 544 (6th Cir. 2004). This doctrine, often referred to as the "treating source rule," is a reflection of the Social Security Administration's awareness that physicians who have a long-standing treating relationship with an individual are best equipped to provide a complete picture of the individual's health and treatment history. _Id._; 20 C.F.R. §§ 416.927(c)(2), 404.1527(c)(2).  The rule indicates that opinions from such physicians are entitled to controlling weight if the opinion is (1) "well-supported by medically acceptable clinical and laboratory diagnostic techniques" and (2) "not inconsistent with the other substantial evidence in the case record." _Wilson_, 378 F.3d at 544.

When a treating source's opinion is not entitled to controlling weight, the ALJ must determine how much weight to assign to the opinion by considering factors set forth in the governing regulations. 20 C.F.R. §§ 416.927(c)(1)-(6), 404.1527(c)(1)-(6).  The regulations also require the ALJ to provide "good reasons" for the weight ultimately assigned to the treating source's opinions that are sufficiently specific to make clear to any subsequent reviewers the weight given to the treating physician's opinions and the reasons for that weight. *See Wilson*, 378 F.3d at 544 (*quoting* S.S.R. 96-2p, 1996 WL 374188, at *5).

In the present case, the ALJ thoroughly summarized Dr. Hiestand's three medical source statements. (Tr. 21-22).  The ALJ acknowledged that Dr. Hiestand treated Plaintiff for a lengthy period of time and was reporting within the bounds of his professional certifications. (Tr. 21). For a number of good reasons, however, the ALJ concluded that the doctor's opinions should be awarded only "little weight." (Tr. 21-22).  Despite Plaintiff's contention to the contrary, the ALJ's reasons are supported by substantial evidence in the record and sufficient to comply with the requisites of the treating source rule.

To begin, the ALJ provided reasonable grounds to devalue the doctor's opinions with regard to physical limitations. The ALJ correctly observed that the August 2012 and August 2013 physical functional capacity opinions were inconsistent with one another. (Tr. 21-22).  In August 2012, Dr. Hiestand indicated that Plaintiff could not perform any physical labor.  On the other hand, one year later, during August 2013, the doctor felt that Plaintiff could perform a limited range of physical tasks. (*Id.*).  Additionally, the ALJ observed that Dr. Hiestand based his August 2013 physical limitations on Plaintiff's bilateral carpal tunnel syndrome, which was a diagnosis that the doctor never made while treating Plaintiff.  (Tr. 22).  Nor was it made by any other treatment provider.  The Court is unable to find this diagnosis in the record and Plaintiff

16

has not directed the Court to it.  Such reasoning sufficed to support the ALJ's decision not to fully adopt the doctor's physical findings.

Regarding mental restrictions, the ALJ explained that Dr. Hiestand's report was inconsistent with Dr. Huston's observations of Plaintiff's psychological condition. (Tr. 22). Unlike the severe limitations Dr. Hiestand recommended, Dr. Huston found that Plaintiff would have few mental limitations and they would be mild in severity. (Tr. 293-94).  Moreover, Dr. Huston's psychological examination revealed generally normal findings, which undermined the inability to perform the many mental tasks that Dr. Hiestand identified.  These observations included no abnormalities in speech or thought content; an appropriate affect and cooperative mood; no motor manifestations of anxiety; a full orientation; and average intellectual functioning. (Tr. 295-96).  Additionally, the ALJ found Dr. Hiestand's severe psychological restrictions did not comport with the doctor prescribing only conservative mental health treatment in the form of psychotropic medication. (Tr. 22).  Finally, the doctor's treatment notes did not reflect severe mental restrictions. (*Id.*).

Plaintiff also contends that the ALJ erred by failing to address the factors denoted in 20 C.F.R. §§ 416.927(c), 404.1527(c) in justifying the weight attributed to Dr. Hiestand's opinion. But Plaintiff has not identified, and the Court is unaware of, any binding case law demanding an ALJ to specify how she analyzed each of these factors individually.  The regulations only require the ALJ to provide "'good reasons . . .  for the weight . . .  given to the treating source's opinion'—not an exhaustive factor-by-factor analysis." *Francis v. Comm'r of Soc. Sec.*, 414 F. App'x 802, 804 (6th Cir. 2011) (alterations in original).  The "good reasons" requirement only demands the ALJ to *consider* the factors provided in the regulations. *Blanchard v. Comm'r of Soc. Sec.*, No. 11-CV-12595, 2012 WL 1453970, at *16-17 (E.D. Mich. Mar. 16, 2012), *report*

17

*& recommendation adopted* 2012 WL 1432589.  While including a thorough assessment of each factor might be helpful in assisting a claimant to better understand the ALJ's decision, so long as the ALJ's opinion clearly conveys why the doctor's opinion was credited or rejected, the ALJ has satisfied his burden. *Francis*, 414 F. App'x at 804.

Here, the ALJ adequately accounted for the factors set out in the regulations, including treating relationship, consistency, supportability, and specialization. (Tr. 21-22).  The ALJ acknowledged that some of these factors weighed in favor of recognizing the limitations Dr. Hiestand assigned.  Nevertheless, the ALJ provided reasonable and well-supported grounds for the decision not to adopt Dr. Hiestand's opinions. (*Id.*).  Accordingly, Plaintiff's second assignment of error is not well taken.

## VII.  DECISION

For the foregoing reasons, the Magistrate Judge finds that the decision of the Commissioner is supported by substantial evidence.  Accordingly, the final decision of the Commissioner is AFFIRMED.

IT IS SO ORDERED.

s/ Kenneth S. McHargh
Kenneth S. McHargh
United States Magistrate Judge

Date: August 12, 2015.